La SALLE NATIONAL BANK & TRUST COMPANY, Trustee, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (4th Division)   No. 83—2013

Opinion filed November 1, 1984.

Bertram A. Stone and David B. Pogrund, both of Stone, Pogrund & Korey, of Chicago, for appellant.

James D. Montgomery, Corporation Counsel, of Chicago (Jerome A. Siegan and Lynn K. Mitchell, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE ROMITI delivered the opinion of the court:

LaSalle National Bank and Trust Company (the bank), as trustee under a land trust agreement involving certain property in downtown Chicago for which the bank possessed a permit to connect its sewers to those of the city of Chicago, appeals from the entry by the circuit court of Cook County of a directed verdict and judgment in favor of the city. The judgment was entered by the court after hearing evidence on the bank's complaint which alleged that the city's revocation

of the bank's sewer connection permit should be enjoined on the grounds of equitable estoppel and unconstitutionality as a violation of procedural due process, a taking of private property for public use without just compensation, and an invalid exercise of municipal authority to protect public health and safety. In its appeal, the bank alleges reversible error in the trial court's determinations with regard to its equitable estoppel, procedural due process, and taking of private property claims.

We affirm.

The downtown Chicago property of which the bank is trustee is commonly known as 2 North Riverside Plaza. It is a multistory office building, bounded on the east by the Chicago River, on the west by Canal Street, on the north by Washington Street, and on the south by Madison Street. The bank became trustee of the property in 1969.

The building was originally constructed in 1927. At that time, a sewer connection permit was obtained from the city of Chicago to allow for connection of the building's four sewers to the city's sewer main in the vicinity—a double-barreled combination storm-sanitary main running east-west under Washington Street between Canal Street and the Chicago River which had been built by the city in 1916. On November 14, 1977, the city council of the city of Chicago enacted the following ordinance pursuant to section 31—3 of the Chicago Municipal Code to revoke the bank's sewer connection permit:

> "WHEREAS, Prior to this date, to-wit: 1929, sewer connection permits were issued to the Riverside Plaza Building, No. 2 N. Riverside Plaza, Chicago, Illinois; and
>
> WHEREAS, The City Council of the City of Chicago, after due investigation and consideration, has determined that the nature and extent of the public use and the public interest to be subserved is such as to warrant the demand that the said City Council revoke and annul such permits; and
>
> WHEREAS, The Municipal Code of Chicago, Permit requirements, Section 31—3 provides as follows:
>
> 'Permission to lay sewers or drains or make connections with sewers or drains in the public ways shall not be granted except upon the agreement, in writing, of the persons applying therefor that said work will be performed by a duly licensed drain layer, that the permittee will comply with the ordinances in relation to excavating the streets, that the permittee will indemnify the city for any damages or costs to which it may be put by reason of injuries resulting from neglect or carelessness in performing the work, and that no

claim will be made by them or their successors in interest against the city or for exemption from an assessment lawfully imposed for constructing sewers or drains in the vicinity of their property, and upon the further condition that the city council may at any time revoke and annul such permission and direct such sewers, drains or pipes to be taken up or removed'; now, therefore,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:

Section 1. That the sewer connection permits heretofore issued to the Riverside Plaza Building, No. 2 N. Riverside Plaza, are hereby revoked and annulled.

Section 2. That such sewers, drains or pipes servicing said building be taken up and removed immediately.

Section 3. That the Commissioner of Water and Sewers immediately notify the said Riverside Plaza Building, No. 2 N. Riverside Plaza, Chicago, Illinois, of this revocation and annulment.

Section 4. This ordinance shall be in force and effect from the date of its passage." Journal of the Proceedings of the City Council of the City of Chicago, Ill. 6273 (November 14, 1977).

The bank filed its action to contest the validity and enforceability of this ordinance in February 1978. At trial the bank presented the testimony of one individual, Lester Barret, manager of the building since 1966. It also introduced into evidence several pieces of documentary evidence, including the 1927 sewer permit, correspondence between the Metropolitan Sanitary District, the city of Chicago and Barret, and sets of plans showing the location of the city's sewer main to which the building's sewers were connected. None of this documentary evidence is included in the appellate record before us.

Barret testified that from 1972 to 1977 a series of meetings were held between representatives of the bank, the city of Chicago, and the Metropolitan Sanitary District. He stated that the purpose of these meetings was to attempt to reach an agreement regarding the reconstruction of the building's sewer lines which were connected to the city's main. Barret further testified that this reconstruction was necessitated because of "outfall from the double-barreled main [in]to the Chicago River." The precise nature of this "outfall" is unclear from the record before us. Certain documents admitted into evidence by the trial court may have elucidated Barret's phrase, but are not part of the record on appeal. Counsel for both the bank and the city have amplified upon the nature of this overflow problem in their briefs, but

with disagreement on its cause and remedy. In any event, both parties agree and the trial court concluded that during times of heavy rainfall the double-barreled sewer main overflows and causes raw sewage in the main to flow directly into the Chicago River.

Barret stated that the meetings between the bank, the city and the Metropolitan Sanitary District were terminated in 1977 because the parties could not agree on allocating the cost to reconnect the bank's sewers to another main. He also stated that he never received any notices from the Metropolitan Sanitary District that the building's use of the main violated sewage or environmental laws of the city of Chicago, the State of Illinois, or the United States government. Barret testified that he requested an estimate of the cost to reroute the building's sewage, although a copy of this estimate is not part of the record on appeal. However, in its oral pronouncement of a directed verdict the trial court observed that "the estimate appears to be in the neighborhood of $84,000 ***." We will therefore disregard those unsupported comments by bank's counsel in this appeal that the cost of such reconnection would be "in excess of $300,000."

■ After the bank rested its case, the city moved for a directed verdict. The trial court granted this motion in a written order dated July 27, 1983, in which it found that the bank had failed to sustain its burden of proof to overcome the presumption of validity of the disconnect ordinance enacted by the city council and had failed to show that the ordinance did not have a substantial relation to the public health, safety, and general welfare. The court's order also incorporated its findings of fact and conclusions of law. At that time, the court determined, *inter alia*, that the bank's sewer permit was a revocable license which the city reasonably revoked in order to foster the greater public benefit of clean waterways and that the doctrine of equitable estoppel was inapplicable to bar enforcement of the disconnect ordinance. Based on these findings and conclusions, the trial court granted the city's motion for a directed verdict and held that the November 14, 1977, ordinance was legal, valid, constitutional and enforceable as applied to the subject property. On August 22, 1983, the bank filed its notice of appeal. We note that because the appeal challenges the trial court's granting of a motion for a directed verdict in favor of the city, we must view all the evidence presented and make all reasonable inferences therefrom in the manner most favorable to the bank, and affirm the trial court's judgment only if the evidence so overwhelmingly favors the city that no contrary judgment on the evidence could stand. See *Mort v. Walter* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d

494, 510, 229 N.E.2d 504.

### EQUITABLE ESTOPPEL

The bank argues that the evidence it presented established that the city should be equitably estopped from revoking its sewer connection permit. Specifically, the bank alleges that the doctrine is applicable because the city permitted the bank's use of the sewer main since 1927, because the bank did not violate the terms of the permit or any pollution standards, and because it substantially relied upon the permit. The city responds that it had a strong governmental interest in combating water pollution and consequently should not be estopped from protecting this interest even where a permittee has expended sums of money in reliance on the permit or will have to bear expense to comply with the terms of the ordinance.

The doctrine of equitable estoppel may be applied to municipal actions taken pursuant to the municipality's police power to protect public health and safety, but only under compelling circumstances. (*Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 448, 220 N.E.2d 415, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957; *Tyska v. Board of Education* (1983), 117 Ill. App. 3d 917, 930-31, 453 N.E.2d 1344; *Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 439-40, 289 N.E.2d 484.) "In applying the doctrine of estoppel, the courts will not decide the question by mere lapse of time but by all the circumstances of the case, and will hold the public estopped or not as right or justice may require. [Citations.] The doctrine is invoked only to prevent fraud and injustice. [Citation.]" (*City of Quincy v. Sturhahn* (1960),. 18 Ill. 2d 604, 614, 165 N.E.2d 271.) To equitably estop a municipality acting in its governmental capacity, the party raising the claim must prove that there were affirmative acts by the municipal officers which induced the claiming party to take some action in reliance thereon under circumstances where it would be inequitable to permit the municipality to stultify itself by retracting what its officers had previously done. *Cities Service Oil Co. v. Des Plaines* (1961), 21 Ill. 2d 157, 161, 171 N.E.2d 605.

The trial court in the case at bar determined that the bank had failed to present *prima facie* evidence of compelling circumstances to justify an equitable estoppel of the city's revocation of the permit, and we cannot say that this determination was erroneous. The record discloses no affirmative representation on the part of the municipality or one of its officers that the permit would never be revoked. Indeed, section 31—3 of the Chicago Municipal Code specifi-

cally states that the city council may revoke a permit at any time.[1] (Chicago Municipal Code sec. 31—3 (1983).) Furthermore, nothing in the record indicates that the bank was ever informed by any municipal officer that this provision did not apply to the bank's permit. In addition, since the bank's permit is not included in the record and it was the bank's responsibility as appellant to provide a complete record, we must presume that the permit admitted into evidence by the trial court supported its rulings and judgment. (See *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92, 459 N.E.2d 958.) Consequently, we must assume that the permit did not contain language which varied from or contradicted the terms of section 31—3 of the Municipal Code to the effect that the permit could be revoked at any time by the city council.

■ The bank's claim that the city should be equitably estopped from revoking the permit because it allowed use of the main since 1927, because the bank relied upon the permit, and because the city did not inform the bank that it had violated any of the terms of the permit or environmental or health regulations is unpersuasive. Lapse of time does not of itself prove compelling circumstances which justify application of the doctrine. (*City of Quincy v. Sturhahn* (1960), 18 Ill. 2d 604, 614, 165 N.E.2d 271.) Any claim that the bank relied upon continued use of the permit when it purchased the property is unsupported anywhere in the record; even assuming *arguendo* that such reliance was made, it would not prove circumstances sufficient to estop revocation of the permit. The evidence the bank presented established that the sewer main was constructed in 1916, had been in use for over 50 years, and caused raw sewage pollution of the Chicago River during periods of heavy rainfall. We cannot say that under such circumstances it was fraudulent or unjust for the city to revoke the bank's permit in order to alleviate such pollution of the river.

■ *Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 289 N.E.2d 484, upon which the bank strongly relies, is distinguishable from the instant case. In *Wachta*, the court emphasized that:

> "*** the State of Illinois, through its Sanitary Water Board, did the positive act of issuing sewer permits to Petitioners which induced them to continue their construction project. They, in reliance upon the action of the Water Board, expended substantial sums of money and incurred heavy continuing liabil-

---

[1]We note that such language limiting the permittee's continued connection to municipal sewers has been included in every version of the Chicago Municipal Code's section regarding sewer connection permits since the first code was adopted in 1890.

ities which would be lost should the State now be permitted to retract what its officials had done. Under these circumstances right and justice require that the public be estopped." (8 Ill. App. 3d 436, 440, 289 N.E.2d 484.)

Here, the only affirmative act on the part of the city was the issuance of a sewer connection permit in 1927. The bank has not established any reliance on its part by which it "expended substantial sums of money and incurred heavy continuing liabilities *which would be lost*" should the city revoke its permit. The evidence presented by the bank shows that it constructed its private sewers connecting to the city's main in 1927 and that they have been in use for over 50 years. The record simply establishes that the bank, after using the city's sewer main for 50 years, does not now desire to spend monies to construct new sewers connecting to another part of the municipal sanitation system, even though continued use of the 1916 sewer main causes raw sewage to flow directly into the Chicago River during periods of heavy rainfall. While the bank's position may be understandable, in our view it does not rise to the level of compelling circumstances which would justify an equitable estoppel of the city from exercising its police power to protect against pollution of the Chicago River which endangers public health and welfare.

### PROCEDURAL DUE PROCESS

Next, the bank argues that its sewer connection permit should have been held to be constitutionally protected property, on the theory that its substantial reliance on the permit rendered the permit a vested interest.[2] The city, for its part, has focused upon its authority to exercise its police power to protect public health by prohibiting pollution of the Chicago River. In short, neither party has forthrightly addressed the issue.

It seems to us that the starting point in an analysis of the bank's claim is whether the sewer connection permit is a constitutionally protected interest in "property." (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, sec. 2; see *Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 293-94, 395 N.E.2d 1376, *appeal dismissed* (1980), 444 U.S. 1062, 62 L. Ed. 2d 744, 100 S. Ct. 1001.) "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral ex-

---

[2]In fact, the bank advances the rather disingenuous argument that this court should determine that the city is equitably estopped from revoking the permit and thus avoid ruling on the constitutional issue it has raised.

pectation of it. He must, instead, have a legitimate claim of entitlement to it." (*Board of Regents v. Roth* (1972), 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709.) In other words, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person *has already acquired* in specific benefits." (Emphasis added.) (408 U.S. 564, 576, 33 L. Ed. 2d 548, 560, 92 S. Ct. 2701, 2708.) Property interests are not created by the Constitution, but by an independent source such as State laws, local ordinances, or mutually explicit understandings. (408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709.) Moreover, such an interest does not depend on whether the benefit accorded by the State is called a "right" or a "privilege." See *Graham v. Richardson* (1971), 403 U.S. 365, 374, 29 L. Ed. 2d 534, 543, 91 S. Ct. 1848, 1853.

■■■ ■ As a general rule, a permit to connect to municipal sewers is in the nature of a license only; it does not create a vested right to such connection. (*Village of Menomenee Falls v. Michelson* (Wis. App. 1981), 104 Wis. 2d 137, 143, 311 N.W.2d 658, 661-62; *Ericksen v. City of Sioux Falls* (1944), 70 S.D. 40, 54-55, 14 N.W.2d 89, 95-96; see also *Camp v. Village of Barre* (1894), 66 Vt. 563, 568-69, 29 A. 1022, 1023-24.) The permit does not become a vested interest once the permittee thereafter expends sums to construct private drains to connect his premises to the public sewers. (*Russell v. City of Pacific Grove* (1975), 54 Cal. App. 3d 53, 60, 126 Cal. Rptr. 371, 375-76.) Consequently, "[i]f, for any reason, the system will not handle sewage from a particular source by reason of its nature or quantity, it is within the power of the municipality to require that the sewer connection be discontinued, and it may be the duty of the municipality to do so in order to protect itself from possible liability for the creation of a nuisance." *Village of Menomenee Falls v. Michelson* (Wis. App. 1981), 104 Wis. 2d 137, 143, 311 N.W.2d 658, 661; see also *Ericksen v. City of Sioux Falls* (1944), 70 S.D. 40, 54, 14 N.W.2d 89, 95-96; see generally 11 E. McQuillin, The Law of Municipal Corporations sec. 31.31, at 233 (3d ed. 1983).

■■■ We hold that the bank had no clear entitlement to continued enjoyment of the use of the public sewer main granted by the permit. The relevant provision of the Code specifically stated that a sewer connection permit ws revocable at any time by the city council. (Chicago Municipal Code sec. 31—3 (1983).) Such a permit is consequently a license, *i.e.*, permission to do an act or series of acts upon the land of another without possessing any estate or interest in such land, which can be revoked at any time. (*Mueller v. Keller* (1960), 18 Ill. 2d

334, 340, 164 N.E.2d 28; *Keck v. Scharf* (1980), 80 Ill. App. 3d 832, 835, 400 N.E.2d 503.) In our view, the permit therefore created no more than a unilateral aspiration of continued permissive use of municipal sewer systems. We note once more that since the 1927 permit under which the bank claims entitlement is not included in the record, we must presume that it did not contain terms which varied from or contradicted the provision of section 31—3 of the Code. Because we determine that the permit was not constitutionally protected property, we conclude that revocation did not violate due process.

■■■ The bank's contention that it had a vested right to connection because of substantial reliance on the permit is without merit. Our thorough review of the record discloses no evidence to support the bank's allegation of reliance upon the permit when the building was purchased. Moreover, even assuming *arguendo* that such reliance could have been proved in this case, it is not, as we see it, sufficient to establish substantial reliance, since any purchaser likely knew or should have known that the permit had been granted on the express "condition that the city council may at any time revoke and annul such permission ***." (Chicago Municipal Code sec. 31—3 (1983).) As a result, any reliance by the bank would have been misplaced and no more than an abstract desire for continued use and enjoyment of the city's sewer main. Furthermore, the bank and its predecessors in title were permitted use and enjoyment of connection to municipal sewers for half a century; the bank's position is thus distinguishable from the landowners in the case on which the bank relies, whose building permits were revoked before they had been able to complete construction and obtain any use and enjoyment of their premises. See *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove* (1959), 16 Ill. 2d 183, 190-91, 157 N.E.2d 33.[3]

TAKING OF PRIVATE PROPERTY FOR PUBLIC USE

In its complaint requesting injunctive relief, the bank alleged that

---

[3]Our independent research has discovered two Illinois cases which hold that a landowner has a vested interest in connecting to specific municipal sewers when the landowner has paid a special assessment levied to construct those sewers. (*La Salle National Bank v. Village of Riverdale* (1959), 16 Ill. 2d 151, 157-58, 157 N.E.2d 7; *Frank v. State Sanitary Water Board* (1961), 33 Ill. App. 2d 1, 6, 178 N.E.2d 415.) There is no evidence in the record before us to indicate that the bank or any of its predecessors in title paid any special assessment levied by the city for construction of the sewer main to which the bank's permit allowed connection in the case at bar. As a result, we do not address the question of whether payment of such assessment would establish a landowner's entitlement to connection for purposes of imposing due process protection.

revocation of its permit constituted a taking of private property for public use without just compensation. The bank raises this issue again on appeal, although it has done no more than make the bare allegation that revocation was invalid for this reason with no citational support and only some argument based upon the facts of the case. The city has made no substantive response to this claim by the bank.

■ The Illinois Constitution prohibits a taking or a damage to private property for public use without just compensation. (Ill. Const. 1970, art. I, sec. 15.) An injunction is the proper remedy only when an unlawful appropriation of land is attempted for use by a public corporation which has not acquired this right by condemnation or otherwise. (*Chicago Title & Trust Co. v. Village of Burr Ridge* (1976), 41 Ill. App. 3d 112, 113, 354 N.E.2d 61.) Thus, only an actual physical invasion of property constitutes a "taking" for which injunctive relief is appropriate. (*Department of Transportation v. Rasmussen* (1982), 108 Ill. App. 3d 615, 621, 439 N.E.2d 48; *Department of Transportation v. Lake Ka-Ho, Inc.* (1981), 98 Ill. App. 3d 1052, 1055, 425 N.E.2d 50.) Anything less than a "taking" may be considered a "damage" to a landowner's property interests, for which the proper remedy is an action at law for damages. *Granite City Moose Lodge No. 272 v. Kramer* (1983), 96 Ill. 2d 265, 271, 449 N.E.2d 852; *Citizens Utility Co. v. Metropolitan Sanitary District* (1974), 25 Ill. App. 3d 252, 255-58, 322 N.E.2d 857.

■ In the case at bar, the bank's complaint requests injunctive relief for a "taking" of its property for public use. The bank has failed to establish, however, any physical invasion of its property for which such relief would be proper. Revocation of the permit certainly entailed no appropriation of the bank's sewers or land. No issue has been raised by the bank concerning any consequential damage to its property; such a question would furthermore be improperly raised in this case, as the bank requested only injunctive relief. We therefore do not address any possible consequential damage that revocation may have caused. We find no basis for the bank's allegation of error in the trial court's judgment.

For the reasons stated, the judgment of the trial court is affirmed.

· Affirmed.

LINN, P.J., and JOHNSON, J., concur.